# EXHIBIT 2

## REMIXER AGREEMENT



Dated as of: April 27, 2015 ("Effective Date")
Executed: _September 7_____, 2015



Dear ███

     This agreement, when signed by you and by ███████████ ("we" or "us") shall constitute the agreement with respect to your engagement to remix two (2) master recordings ("Master(s)") embodying the musical compositions presently entitled ███████ ████████ and ██████████ ("Composition"), featuring the performances of the artist ██████████ professionally known as ███ ("Artist"), for the manufacture and distribution of records, including, but not limited to, for possible inclusion on an album and/or albums ("Album(s)") comprised of master recordings embodying Artist's performances to be distributed by us, our licensees and/or pursuant to an agreement ("Distribution Agreement") between us and a reputable record distribution company ("Distributor"). It shall be understood that if we enter into more than one (1) Distribution Agreement with respect to the Masters, the terms "Distributor" and "Distribution Agreement" as used herein shall be deemed to refer to any and all applicable Distributors and Distribution Agreements, as the case may be at that time.

1.    <u>Services</u>:

    (a)    Commencing on or about the Effective Date and ending on our acceptance of the Masters ("Term"), you will edit and remix the Masters pursuant to a production schedule designated by you and us (subject to our final approval). Your services are non-exclusive, but on a non-material interference basis as to us during the Term.

    (b)    The Masters shall, from the inception of their creation, be considered "works made for hire" for us within the meaning of the Copyright Act of 1976 (Title 17, U.S.C.), as amended. If it is determined that the Masters do not so qualify, then the Masters, together with all rights therein (including the sound recording

copyright of the Masters), shall be automatically assigned to us by this agreement. Without limiting the generality of the preceding sentence, we, and our designees, as the case may be, shall have the exclusive, unrestricted and perpetual right throughout the universe ("Territory") to use, distribute, sell, license and exploit the Masters in any and all media. You shall execute any further documents which we may reasonably deem necessary or desirable to effectuate the intent and substance of this agreement (including, without limitation, documents in connection with the U.S. Copyright Office). If you shall fail or refuse to execute and deliver any such further document(s) after reasonable opportunity to review and negotiate in good faith (i.e., within ten (10) business days following our request therefor), you hereby appoint us as your true and lawful attorney-in-fact solely to execute such document(s) in your name and on your behalf. Such power of attorney is irrevocable and is coupled with an interest. We shall provide you with copies of any such documents upon your reasonable request.

(c)     You shall deliver the Masters to us on dates to be mutually agreed upon by you and us. You shall perform such services as are customarily performed by remixers in the recording industry, including, without limitation, engaging musicians, vocalists, conductors, contractors, arrangers and copyists, and arranging for the use of recording studios and other necessary technical facilities and personnel. All job sheets, union contract forms and session report forms for recording sessions hereunder, all bills pertaining to such recording sessions, and all payroll forms (including, without limitation, all W-4, Form B, and other withholding tax forms) pertaining to such recording sessions shall be submitted by you to us promptly following each recording session and in accordance with the rules and regulations of all unions having jurisdiction over the recording thereof, so that we shall be able to make all payroll payments without incurring late penalties. You shall not be responsible for any late payment penalties unless such penalty was incurred solely by reason of your acts or omissions. The Masters shall be commercially and technically satisfactory to us.

**2.     Recording Costs:**

We shall pay all Recording Costs (as defined in the royalty provisions ("Royalty Provisions") attached hereto as Exhibit A and made a part hereof) with respect to the Masters in accordance with a budget approved by us, such approval not to be unreasonably withheld.

**3.     Royalties:**

(a)     In consideration of the rights granted to us and all services rendered by you in connection with the Masters, provided that you are not in breach of your material obligations hereunder, and provided that the Masters have been delivered and are commercially and technically satisfactory to us, we shall pay you a royalty ("Royalty") at a basic rate of one (1%) percent of the PPD (as defined in the

Royalty Provisions) for net sales through normal retail channels in the United States of Albums containing a Master ("Remixer's Base Rate").  Unless otherwise set forth herein, the Royalty payable to you for foreign sales, singles, budget records, club sales and other sales or uses of a Master remixed hereunder shall be reduced and prorated in accordance with the Royalty Provisions.  With respect to sales or uses of a Master for which we receive a percentage of net receipts, net monies, or the like, or a flat fee, your Royalty hereunder in respect of such sale or use shall be equal to fifty (50%) percent of the amount actually received by (or credited to us against an advance previously received by) us, multiplied by a fraction, the numerator of which is equal to the Remixer's Base Rate, and the denominator of which is equal to sixteen (16%) percent ("Artist's Deemed Basic Rate").

(b)     As to records embodying the Masters but not consisting entirely of the Masters, the Royalty as provided herein with respect to such sales shall be pro-rated by multiplying the Royalty by a fraction, the numerator of which is the number of Masters embodied thereon and the denominator of which is the total number of royalty-bearing recordings embodied thereon, including the Masters. We shall accord you so-called "A-Side" protection with respect to the release of any single record embodying a Master on the "A-Side" thereof.

(c)     INTENTIONALLY OMITTED.

(d)     INTENTIONALLY OMITTED.

(e)     Notwithstanding anything to the contrary contained in this agreement, it is specifically understood and agreed that no royalties shall be payable to you hereunder unless and until we have recouped all Recording Costs (excluding so-called "in pocket" Artist advances) incurred in connection with the Masters from our "net artist" royalties (i.e., Artist's Deemed Basic Rate less the royalties payable to all other producers, engineers, mixers, remixers, side and featured artists, and all other third party royalty participants). After recoupment of such Recording Costs in accordance with the preceding sentence, the Royalty shall be payable to you hereunder for all records sold for which royalties are payable, retroactive to the first record sold.

(f)     Pursuant to a letter of direction in the form of Exhibit B attached hereto and made a part hereof, we shall instruct SoundExchange to account directly to you at the same time and subject to the same conditions pursuant to which it accounts to Artist. Our inadvertent, non-repetitive failure or the failure for any reason of SoundExchange to do so shall not constitute a breach hereof.

4. **Accounting:**

    (a)    With respect to royalties payable to you hereunder, and notwithstanding anything to the contrary otherwise set forth in this agreement, we shall account for and pay directly to you the royalties due you hereunder, on a semi-annual basis, within ninety (90) days of the end of December 31 and June 30.

    (b)    All accountings rendered by us, or on our behalf, to you shall be binding upon you and not subject to any objection by you for any reason unless specific written objection by you stating the basis thereof is furnished to us within twenty-four (24) months from the date rendered. You shall be foreclosed from maintaining any action, claim or proceeding against us with respect to any statement or accounting due hereunder unless such action, claim or proceeding is commenced against us in a court of competent jurisdiction within thirty (30) months after the date such accounting is rendered.

    (c)    You shall have the right to appoint a certified public accountant who is not then currently engaged in an outstanding audit of us, to examine our books and records relating to the sale of records embodying the Masters and other exploitations of the Masters, provided that such examination shall take place at our offices during normal business hours, on reasonable written notice, not more frequently than once in any calendar year and at your sole cost and expense. You shall furnish us with a copy of the audit report within sixty (60) days after the completion of the applicable audit.

    (d)    In the event that we elect to conduct an examination of Distributor's or licensee's books and records, and as a result of such examination we receive additional royalty payments from a Distributor or licensee in respect of sales of records for which royalties are otherwise payable to you hereunder, you shall be paid your pro rata share of royalties derived from such additional sales of records after deduction of our directly related third party audit costs "off the top."

5. **Payments:**

Payment of the Royalty and accounting statements relating thereto shall be made payable and remitted to your address first set forth above.

6. **Credit:**

Provided that you are not in breach or default hereof, we shall, or we shall instruct Distributor and our licensees to, accord you credit on the liner notes and in the metadata of all formats and configurations of the applicable Album(s) and other records derived from the Masters and in all one-quarter (1/4) page or larger trade and consumer advertisements (specifically including Billboard strip-ads) placed in the United States by

or under the control of us, Distributor or our licensees that relate solely to the Masters, in substantially the following form:

"Remixed by "

All such credits shall be subject to our, our licensees' and/or the applicable Distributor's normal policies. No inadvertent non-repetitive failure to accord any such credit shall be deemed to be a breach hereof, provided that following our receipt of written notice from you of a failure to accord such credit as set forth herein, we shall rectify or instruct Distributor and/or our licensees to rectify same on a prospective basis with respect to materials thereafter manufactured by us, our licensees, and/or Distributor or advertisements thereafter placed by Distributor, our licensees or us (as the case may be).

7.  **Name and Likeness:**

You hereby grant to us, our licensees and Distributor the exclusive right to use your name, pre-approved likeness and pre-approved biographical material concerning you solely in connection with the sale, advertising and promotion of records derived from the Masters, including, but not limited to, the applicable Album(s).  You shall have a right of reasonable approval for all likenesses and biographical material concerning you used by Distributor, our licensees or us, provided that (a) you respond within three (3) business days of our request for such approval (otherwise the use shall be deemed approved), and (b) such approval shall not be unreasonably withheld or delayed.

8.  **Representation and Warranties:**

(a)  You hereby represent and warrant that:

(i)  Solely to the extent of your contributions  to the Masters hereunder, we shall not be required to make any payment of any nature for, or in connection with, the rendition of your services or the acquisition, exercise or exploitation of rights by us pursuant to this agreement, except as specifically provided herein;

(ii)  Solely to the extent of your contribution thereto, there shall be no liens, encumbrances or other charges against the Masters at the time of delivery, including, without limitation, any uncleared samples;

(iii)  To the best of your knowledge (after due diligence), all materials furnished by you in connection with the Masters shall be original and not infringe upon or violate the rights of any third parties; and

(iv)  You will not produce for any person or entity other than us a master recording embodying any musical composition embodied in the Masters for three (3) years from the date of delivery of the Masters to us.

(b)     We hereby represent and warrant that:

    (i)     We have the full right, power and authority to enter into this agreement and perform our obligations hereunder; and

    (ii)    To the best of our knowledge (after due diligence), all materials furnished solely by us in connection with the Masters shall not infringe upon or violate the rights of any third party.

## 9.    Indemnification:

(a)     You agree to indemnify and hold us and our successors, assigns, agents, companies and licensees harmless against any claim, liability, cost and expense (including reasonable outside attorneys' fees and actual, out-of-pocket legal costs reasonably incurred) in connection with any third party claim which is inconsistent with any agreement, covenant, representation, or warranty made by you herein which has been reduced to a final adverse judgment or has been settled with your prior written consent, which consent shall not be unreasonably withheld or delayed.   Notwithstanding the foregoing, if you withhold consent to any settlement which we are willing to make, the foregoing indemnity shall apply and we may settle such claim in our sole discretion unless you promptly assume all costs attributable to the defense of such claim, demand or action, including, without limitation, actual, out-of-pocket court costs, reasonable outside attorney's fees, and direct expenses theretofore actually incurred and paid for by us in connection with said claim, demand or action, or furnish us with an acceptable bond guaranteeing such payment; provided that in the event you assume said costs, we shall nonetheless have the right to settle such claim, demand or action in our sole discretion without your consent, provided that in such event, the foregoing indemnification shall not apply with respect thereto.   You will reimburse us upon demand for any payment made by us at any time after the date hereof including after the Term in respect of any claim, liability, damage or expense to which the foregoing indemnity relates.  Pending the resolution of any such claim, we may withhold monies that would otherwise be payable to you under this agreement; provided, we shall not withhold such sums if you post a bond in a form and from a bonding company acceptable to and approved by us, in an amount equal to the potential liability at issue. In the event that any such claim does not result in litigation being commenced against us within one (1) year from the date such claim is initially received by us, then any monies withheld by us or Distributor pursuant to the preceding sentence shall be released to you.

(b)     We agree to indemnify and hold you and your successors and permitted assigns (collectively, "Indemnitees") harmless from and against all third party damages, losses, costs and expenses (including reasonable attorneys' fees and actual, out-of-pocket legal costs reasonably incurred) which the Indemnitees may suffer or incur by reason of the breach of any of the warranties, representations or covenants

made in this agreement by us which has been reduced to a final adverse judgment or has been settled with our prior written consent, which consent shall not be unreasonably withheld or delayed.  Notwithstanding the foregoing, if we withhold consent to any settlement which Indemnitees are willing to make, the foregoing indemnity shall apply and Indemnitees may settle such claim in their sole discretion unless we promptly assume all costs attributable to the defense of such claim, demand or action, including, without limitation, actual out-of-pocket court costs, reasonable outside attorney's fees, and direct expenses theretofore actually incurred and paid for by Indemnitees in connection with said claim, demand or action, or furnish Indemnitees with an acceptable bond guaranteeing such payment; provided that in the event we assume said costs, Indemnitees shall nonetheless have the right to settle such claim, demand or action in their sole discretion without our consent, provided that in such event, the foregoing indemnification shall not apply with respect thereto.

10.   **Mechanical Licenses:**

You hereby acknowledge that you have not contributed to the authorship of the musical compositions to be embodied on the Masters.  Accordingly, there shall be no so-called "controlled composition" clause applicable to this agreement and no mechanical royalties shall be payable hereunder to you and/or your publishing designee, if any.  Without limiting the generality of the foregoing, you acknowledge and agree that you have not written or co-written, in whole or in part, the Compositions, and that neither you nor any entity in which you have any interest or which has any interest in you, has any claim of copyright, ownership, income or other interest or lien in or regarding the Compositions either as embodied on the Masters or otherwise and that any such claim or interest is hereby expressly waived and relinquished.  Furthermore, you warrant and represent that neither you nor any such entity shall ever assert any such claim for any reason whatsoever and that your indemnification obligations set forth at paragraph 9(a) above shall apply to any such claim, whether made by you or by any third party as a result of any such claim.

11.   **Samples:**

You warrant and represent that all music and other material furnished by you (including, without limitation, so-called "samples"), and all of your arrangements, compositions, ideas, designs and inventions in connection with the Masters are or shall be original with you or in the public domain throughout the world or used with the consent of the original owner thereof, and shall not infringe upon or violate any copyright, the right of privacy of or any other right of any person or entity.  You shall not "sample" or otherwise incorporate into the Masters ("Sample") or permit any other party to Sample any copyrighted or other proprietary material ("Proprietary Material") belonging to any third party (such third party herein referred to as the "Owner") without first having (a) notified us and Distributor of the Proprietary Material you intend to use and the identity of the Owner(s) thereof; (b) obtained our and Distributor's written approval of such use prior to the mixing of the Master(s) embodying such Proprietary Material; and (c) secured from

0037075.2                                    7

Owner(s), at your sole expense, a written agreement, in a form satisfactory to us and Distributor, that we, Distributor and our respective licensees shall have the perpetual right to use such Proprietary Material in the Master(s), as applicable and to use or otherwise distribute or exploit the Master(s) containing such Proprietary Material for all record purposes and for use in music videos, in perpetuity, all either without any payment whatsoever to Owner(s) or upon payment to Owner(s) of a payment approved in writing by us and Distributor ("Clearance Efforts").  We and Distributor shall not have any obligation to approve or to make any such payment, and our and Distributor's approval of any such payment shall not constitute a waiver of any of our or Distributor's rights or remedies.  You warrant and represent that the Masters shall not contain any Proprietary Material furnished by you which has not been disclosed and licensed so as to allow us, Distributor and our respective licensees to distribute the Masters as fully contemplated in this agreement.  Notwithstanding anything to the contrary contained herein, we and Distributor may, at our sole election and solely as an accommodation to you, undertake control of the Clearance Efforts hereunder.  You acknowledge and agree that any payments made by us and/or Distributor in connection with the Clearance Efforts shall, without limitation of our and Distributor's other rights and remedies, at our and/or Distributor's election, be deemed Recording Costs.  If the Owner(s) seeks a share of the so-called "sound recording rights" for the use of Proprietary Material furnished by you in connection with the Master(s), as between you and us, such clearing costs shall deemed additional Recording Costs hereunder.

12.   **Miscellaneous:**

(a)   All notices to be given by either party hereunder shall be in writing and shall be delivered by hand, by recognized overnight courier, or by United States certified mail, postage prepaid, return receipt requested, to the address of each party as first set forth above until notice of a new address shall be duly given, except that royalty statements and any payments due hereunder, shall be sent to you at such address by regular mail. Copies of any notices to us shall simultaneously be sent to: ███████████████████████████████████████ Copies of any notices to you shall simultaneously be sent to: ███████████ Neither party's failure to send such courtesy copy shall be deemed a breach hereof.

(b)   You shall have the status of an independent contractor hereunder, and except for the purposes of subparagraph 1(b) above, nothing herein contained shall constitute or contemplate you as our or Distributor's agent or employee.

(c)   In the event of a breach of this agreement by either party, the breaching party shall have thirty (30) days from the date of notice from the non-breaching party identifying such breach in reasonable detail to cure such breach.

(d)     This agreement embodies the entire understanding of the parties with respect to the subject matter hereof, cannot be modified without an instrument in writing signed by both parties, and shall be governed by and interpreted in accordance with the laws of the State of New York applicable to agreements entered into and wholly performed in said State, without regard to any conflict of laws principles. You and we hereby agree that the exclusive jurisdiction and venue for any action, suit or proceeding based upon any matter, claim or controversy arising hereunder or relating hereto shall be in the state or federal courts located in the State and County of New York.

(e)     This agreement may be executed in two or more counterparts, each of which together shall be deemed an original, but all of which together shall constitute one and the same instrument. Signatures may be delivered by facsimile or by email in a pdf format and such signatures shall have the same force and effect as an original signature.

If the foregoing accurately sets forth your understanding of the agreement between you and us with respect to the subject matter hereof, please sign this letter where indicated below.

Very truly yours,



**AGREED AND ACCEPTED:**



## EXHIBIT A:
## ROYALTY PROVISIONS

The royalty rates of this Exhibit A shall be applied against your applicable Royalty in respect of Net Sales of the Records concerned as set forth below.  All capitalized terms not defined in this Exhibit A shall have the same meaning as ascribed to them in the Remixer Agreement ("Agreement") between you and us.

(a) Non-Album Configurations in Physical Form: The royalty rate for Net Sales of EPs, Maxi-Singles and Singles in physical form through normal retail channels in the United States shall be 75% of the Royalty Base Price.

(b) Foreign Rate Reductions: The royalty rate for Net Sales of Records sold for distribution in the following territories outside the United States by us or our licensees shall be computed at the applicable percentage of the royalty rate that would otherwise apply to Net Sales in the United States of the Record concerned, as follows: 85% of the otherwise applicable rate in Canada; 80% of such rate in the United Kingdom; 75% of such rate in France, Germany, Australia, New Zealand and Japan; and 66 2/3% of such rate in the rest of the world.

(c) Mid-Priced / Budget Records / PX Records: With respect to Mid-Priced Records and PX Records, the royalty rate shall be 75% of the otherwise applicable royalty rate. With respect to Budget Records and premium Records, the royalty rate shall be 50% of the otherwise applicable royalty rate.

(d) Direct Mail / Mail Order/ Television Advertising Campaign: The royalty rate on any Record described in sections (i) and (ii) of this paragraph (d) shall be 50% of the royalty rate that would otherwise apply if the Record concerned was sold through normal retail channels: (i) any Record sold by us or one of our licensees through any direct mail or mail order distribution method other than the methods described in paragraph (e) below, and (ii) any Record sold in conjunction with a substantial television advertising campaign, during the accounting period in which that campaign begins and the next such period, provided that the aggregate reduction in the royalties credited pursuant to the foregoing clause (ii) shall not exceed 50% of our or our licensee's expenditures in respect of a particular television advertising campaign.

(e) New Technology Formats: For sales by us or one of our licensees of physical Records in any form, format or technology not herein described, which is now known but not widely distributed or which hereafter becomes known (including, without limitation, Super Audio CD and DVD Audio) ("New Technology Formats"), the royalty rate shall be 85% of the otherwise applicable royalty rate.  For avoidance of doubt, Electronic Transmissions are not New Technology Formats.

(f) Electronic Transmissions: The royalty rate for any Record sold by us or our licensees other than in physical form (including via telephone, satellite, cable, point-of-sale manufacturing, transmission over wire or through the air, downloading and any other methods now or hereafter known) shall be 100% of the royalty rate otherwise applicable to the Album on which the Master was originally embodied.

(g) Video: The royalty rate for a Record embodying an audiovisual work primarily featuring the audio soundtrack of the Master ("Video") shall be fifty (50%) percent of the applicable royalty rate.  You shall not be credited with any royalties in respect of the Video unless and until all costs incurred in the production of the Video have been recouped from the royalties credited to Artist in respect of the Video

1

embodying the Master, and following such recoupment, the Royalty for the Video shall be credited to your account on a prospective basis.

(h) Legislative Payments: Notwithstanding anything to the contrary expressed or implied in the Agreement or this Exhibit A, no royalties shall be payable with respect to payments received by us pursuant to any statute or other legislation (including, without limitation, payments for the public performance of recordings or royalties payable for the sale of blank cassettes or for the sale of recording equipment).

(i) Records Sold for Distribution Outside of the United States: Royalties shall be computed in the same national currency as we are accounted to by our licensees and shall be paid at the same rate of exchange as we are paid. Such royalties shall not be due and payable until payment thereof has been received by us in the United States in United States Dollars. If any law, any government ruling, or any other restriction affects the amount of the payments which our licensee can remit to us, we may deduct from royalties otherwise payable under the Agreement and this Exhibit A an amount proportionate to the reduction in the licensee's remittances to us. In the event we are unable to receive payment in United States Dollars in the United States due to governmental regulations, royalties therefor shall not be credited during the continuance of such inability.

(j) Promotional Records: No royalties shall be payable for Records given away or sold at below the applicable PPD for promotional purposes to disc jockeys, reviewers, radio and television stations and networks, motion picture companies, music publishers, our employees, you, any artist or other customary recipients of promotional Records or for use on transportation facilities, Records sold as scrap, salvage, overstock or "cut-outs" or Records sold below cost. We shall have the right to include or to license others to include any one or more of the Masters in promotional Records on which such Masters and other recordings are included, which promotional Records are designed for sale at a substantially lower PPD than the then-prevailing PPD for the majority (or plurality) of our Top Line Records in such format. No royalties shall be payable on sales of such promotional Records.

(k) Definitions: As used herein, the following terms shall have the following meanings:

    (i)    Budget Record - a Record which is sold by us or our licensee(s) at a PPD which is below our or the applicable licensee's then prevailing top-line PPD, which PPD is consistently applied by us to such Records and which Records are sold by us or our licensee(s) as budget Records);

    (ii)    Gross Royalty Base - the PPD applicable to the Record concerned less "program discounts" (i.e., discounts given by way of price breaks or so-called "free goods" to "one stops," rack jobbers, distributors or dealers, whether or not affiliated with us, which are not "standard discounts" (i.e., discounts reflected in the PPD));

    (iii)    Mid-Priced Record - a Record which is sold by us or our licensee(s) at a PPD which is below our or the applicable licensee's then prevailing top-line PPD, which PPD is consistently applied by us to such Records and which Records are sold by us or our licensee(s) as mid-priced Records;

    (iv)    Net Sales - 100% of Records sold by us in the United States or by us, our regular foreign licensees or their distributors, as applicable, to independent third parties (including consumers), for which our regular foreign licensee has been paid or

credited, less Records returned for credit at any time for any reason, including at our request, and less all credits, cancellations, exchanges or other adjustments. Net Sales shall not include the Records described in paragraph (j) above;

(v)    PPD - the published price to dealers utilized by us or our distributors, as applicable, in the United States and by us or our principal licensee in each country outside the United States. We and our principal licensee in Canada both currently refer to the published price to dealers as the "Base Price." For premium Records, the PPD shall be deemed to be the amount actually received by or credited to us against an advance previously received by us;

(vi)    Proportionate Deductions - proportionate amounts of: (A) any sums deducted by a licensee from its payments to us pursuant to any law, any government ruling, or any other restriction affecting the amount of the payments which a licensee can remit to us; and (B) any taxes deducted by a licensee from its payments to us;

(vii)    Record - any form of reproduction, distribution, transmission or communication of Recordings (whether or not in physical form) now or hereafter known (including reproductions of sound alone or together with visual images) which is manufactured, distributed, transmitted or communicated primarily for personal use, home use, institutional (e.g., library or school) use, jukebox use, or use in means of transportation, including any computer-assisted media (e.g., CD-ROM, DVD Audio, CD Extra, Enhanced CD) or use as a so-called "ringtone" in any form (e.g., as so-called "master ringtones," "polyphonic ringtones" and "MIDI ringtones");

(viii)    Recording - any recording of sound or data used in the production of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or hereafter known, which is used or useful in the recording, production and/or manufacture of Records or for any other exploitation of sound;

(ix)    Recording Costs - wages, fees, advances and payments of any nature to or in respect of all musicians, vocalists, conductors, arrangers, orchestrators, engineers, producers, copyists, etc.; payments to a trustee or fund based on wages to the extent required by any agreement between us and any labor organization or trustee; union session scale payable to Artist; all studio, tape, editing, mixing, re-mixing, mastering and engineering costs; artist development costs including physical training, vocal conditioning, cosmetic enhancement and other similar costs, authoring costs; all costs of travel, per diems, rehearsal halls, non-studio facilities and equipment, dubdown, rental and transportation of instruments; all costs occasioned by the cancellation of any scheduled recording session; all amounts paid in connection with the production, conversion, authoring, mastering and delivery of audiovisual materials prepared for or embodied on Records or Videos; all expenses of clearing and licensing any samples embodied on Recordings hereunder; and all other costs and expenses incurred in the production, but not the manufacture, of Recordings and Records hereunder or otherwise made in connection with Artist, which are then customarily recognized as recording costs in the recording industry. If we furnish any of our own facilities, materials, services or equipment for which we

have a standard rate, the amount of such standard rate (or if there is no standard rate, the market value for the services or thing furnished) shall be deemed Recording Costs;

(x)    Royalty Base Price - the Gross Royalty Base applicable to the Record concerned, less excise taxes, duties and other applicable taxes included within the Gross Royalty Base and less Proportionate Deductions, if any;

(xi)    Single - a Record (other than a Video) embodying 3 or fewer different sides

(xii)    Top Line - Our top "price line" or highest "list category" of Records of a particular type sold in the Territory

**EXHIBIT B:**
**SOUNDEXCHANGE LETTER OF DIRECTION**

Solely as a service and accommodation to those featured artists entitled to royalties under 17 U.S.C. § 114(g)(2)(D) who specifically authorize SoundExchange to collect and distribute royalties on their behalf, SoundExchange permits such featured artists to designate that a percentage of the royalties due them from SoundExchange relating to certain sound recordings be remitted to creative personnel credited or recognized publicly for the commercially released sound recording on which the featured artist performs or other usual and customary royalty participants in such sound recording.

Please note that a performer **need <u>not</u> execute this Letter of Direction in order to be paid statutory royalties by SoundExchange.**

To make such a designation, the performer submitting this Letter of Direction ("LOD") must be registered with SoundExchange.

Sections with asterisks are required.

*Name of Solo Artist or Group on recording(s): ████

*Legal Name of Performer(s) for this LOD: ████████

*Name of LOD Recipient ("Payee"): ██████████████

*Payee Address:  ████████████████████

████████████████

Payee Telephone Number: ██████████

*Payee E-Mail: ████████████

*Track Name(s): The Repertoire Chart is required to complete the LOD, please submit with this form.

*Effective Date: (choose one)

☑ Check here if LOD applies as of ██████████ [date]
☐ Check here if LOD applies retroactively to all available SoundExchange royalties, for all LOD tracks
☐ Check here if the Effective Date varies by track. Enter the Effective Dates on the Repertoire Chart.

*Payment Percentage ("Percentage"): check applicable box

☑    6.25    % of Performer royalties are applicable to all LOD tracks
☐ Percentage varies by each track covered by this LOD. Enter percentages on the Repertoire Chart.

0037075.2                              1

By signing this Letter of Direction and submitting it to SoundExchange, Performer agrees as follows:

1.      Performer represents and warrants that Performer is the featured recording artist who performed on the sound recording(s) identified on the "Repertoire Chart" attached hereto as Schedule 1 (the "Recordings").

2.      Performer represents and warrants that Payee is an individual credited or recognized publicly for the commercially released sound recording identified on the Repertoire Chart or is another usual and customary royalty participant in such sound recording.

3.      Performer requests and authorizes SoundExchange to pay to and in the name of Payee an amount equal to Percentage of the royalties otherwise payable by SoundExchange to Performer in respect of the Recordings, thereby reducing the payments from SoundExchange to Performer. If a previous "Royalty Distribution Information for Featured Artist" or other letter of direction has been provided to SoundExchange that conflicts with this Letter of Direction, then any and all previous letters of direction or similar documents conflicting herewith are hereby revoked.

4.      All monies becoming payable under this Letter of Direction shall be remitted to Payee at the address identified above or as Payee otherwise directs SoundExchange in writing. If SoundExchange requires additional information (e.g., Payee tax information) to remit payments under this Letter of Direction, then Performer and Payee shall be responsible for providing SoundExchange with such information promptly. To the extent SoundExchange is not provided with sufficient or correct information to remit payment to Payee, or checks mailed to Payee's last known address are returned, SoundExchange may hold the monies pending receipt of such information or pay the royalties to Performer.

5.      SoundExchange will honor a written revocation by Performer of the designation made by this Letter of Direction. In the event of such a revocation, SoundExchange may, but need not, mail notice of the revocation to the last known address of Payee. The foregoing is without prejudice to any other contractual arrangements between Performer and Payee requiring payment of the Percentage by Performer. SoundExchange has no responsibility for Performer's performance or nonperformance of any such obligation.

6.      SoundExchange may discontinue making payments under this Letter of Direction at any time, including if checks mailed to Payee's last known address are returned, Performer ceases to be a registrant of SoundExchange, or SoundExchange modifies its policies concerning letters of direction. If it does so, then SoundExchange may, but need not, mail notice thereof to the last known address of Performer and Payee, and monies that otherwise would have been payable under this Letter of Direction will be paid to Performer.

7.      Performer acknowledges that SoundExchange is providing payments to Payee solely as an accommodation to Performer but that all royalties distributed by SoundExchange to Payee are taxable to Performer. Performer shall be solely responsible for providing Payee with tax paperwork required by any governmental agency, including the Internal Revenue Service, and SoundExchange shall have no obligation to provide such information to Payee.

8.      SoundExchange may rely conclusively, and shall have no liability when acting, upon any written notice, instruction, other document or signature that is reasonably believed by SoundExchange to be

genuine and to be authorized by Performer. SoundExchange shall not be responsible for failure to act as a result of causes beyond the reasonable control of SoundExchange. SoundExchange shall not be liable to Performer, Payee or to any third party for, and Performer agrees to defend (with counsel satisfactory to SoundExchange), indemnify and hold harmless SoundExchange from, any damages or loss (including reasonable attorney's fees) in any way related to this Letter of Direction, unless such loss is caused by SoundExchange's gross negligence or willful misconduct. The provisions of this Paragraph 8 shall survive the revocation or other termination of this Letter of Direction.

9.      This Letter of Direction shall be governed by and construed in accordance with the substantive laws of the District of Columbia. Any dispute relating to or arising from this Letter of Direction shall be subject to the exclusive jurisdiction of courts sitting in the District of Columbia.

ACKNOWLEDGED AND ACCEPTED BY:

(The signature of each Performer or Authorized Signatory for each Performer is required.)

Performer Signature: _____

*Performer Printed Legal Name: _____

OR, Authorized Signatory: _____

Authorized Signatory Printed Name: _____

Date of Signature: _____

Return the original of this form to:

SoundExchange, Inc.
733 10th Street NW, 10th Floor
Washington, DC 20001

You may also scan and email the completed forms to accounts@soundexchange.com
Or fax to: 202.640.5859

If you have questions, please call 1-800-961-2091 or email accounts@soundexchange.com

0037075.2

3



**Schedule 1 Repertoire Chart for Featured Artist Letter of Direction**

*Name of Solo Artist or Group on Recording(s):

*LOD Recipient Name:

* indicates a Required Field. Other Fields are optional, but assist in identifying reported performances.

| * Sound Recording Track Name(s) | * Percentage Share of artist royalties, for this track, to be assigned to the LOD recipient (as a % only, do not use "points" or fractions) | Effective Date of the LOD for this track (required if tracks have different effective dates) | Track Version (e.g., studio, re-mix version, etc) | Sound Recording Track ISRC | Album or Release Name | Label | Release Date | Other artists on this track (if applicable) |
|---|---|---|---|---|---|---|---|---|
| Track 1 ■ | 6.25% | | | | | ■ | | |
| Track 2 ■ | 6.25% | | | | | ■ | | |

00370752

# REMIXER AGREEMENT

This Remixer Agreement (this "**Agreement**") is made effective as of ___August 25th___, 2017   by  and  between ██████████████████████   ("**Remixer**")  whose  address  is ██████████████████, ██████████████████ ("**Remixer**")  whose  address  is and ██████████████████ ("**Label**") whose address is ██████████ with  regard  to  the  services  of  Remixer  to  produce  and  remix  the  master recording(s) (the "**Master(s)**") of the musical composition(s) listed on Schedule A attached hereto and made a part hereof (the "**Composition(s)**") featuring the performances of ██████ ("**Artist**").

1.   **Services**.  The term of this Agreement (the "**Term**") will commence as of the date hereof and continue until the date on which the Master(s) is delivered to and approved by Label.    During  the  Term,  Remixer  will  produce,  remix  and  deliver  commercially  and technically acceptable Master(s) to Label according to a schedule mutually determined by Label and Remixer.

2.   **Rights**.  Label will own all worldwide right, title and interest, including the copyright, in and to the Master(s) and the results and proceeds of Remixer's services hereunder, free of any claims by Remixer.   The Master(s) will be deemed to be "works made for hire" or prepared  as  part  of  a  work  specially  ordered  by  Label  for  use  as  a  contribution  to  a collective  work.    Remixer  agrees  that,  to  the  extent  (if  any)  Remixer  may  be  deemed  an "author" of the Master(s), Remixer hereby transfers, grants, conveys and assigns to Label, exclusively,  perpetually  and  throughout  the  universe,  all  right,  title  and  interest  in  and  to the Master(s), including, but not limited to, the copyright and all exclusive rights of the copyright owner  thereof  as  specified  in  17  U.S.C.  §106,  and  all  renewals,  extensions  and  revised terms  of  said  copyright  throughout  the  universe.    Remixer  grants  to  Label  a  power  of attorney, irrevocable and coupled with an interest, for Label, in Remixer's name, to apply for and  obtain,  and  on  obtaining  same,  to  assign  to  Label  all  such  rights.    Remixer  expressly waives  any  and  all  so-called  "moral  rights"  of  authors,  rental  rights,  and  comparable  rights relating to Remixer's services hereunder, the Master(s) and any and all versions and copies thereof.    Remixer  will  execute  and  deliver  to  Label  any  and  all  additional  documents reasonably necessary or desirable to convey or confirm Label's rights hereunder.

3.   **Name & Likeness / Credit**. Remixer grants to Label the right to use Remixer's legal name, approved likeness and approved biographical material concerning Remixer in Label's and  Label's  designee's,  licensee's  and  assignee's  advertising  in  connection  with  the exploitation  of  the  Master(s),  and  any  and  all  records  and  other  reproductions  made therefrom, and advertising and promotion in connection therewith.

4.   **Fee / Royalties**. In consideration for Remixer entering into this Agreement and Remixer  performing  Remixer's  material  obligations  hereunder,  Label  will  pay  to  Remixer  on exploitations  of  the  Master(s)  by  Label,  including  third-party  licensing  and  distribution, Remixer will be paid twelve and a half percent **(12.5%)** of Label's Net Income earned and payable  to  Label  from  such  exploitations.    As  used  herein,  the  term  "Net  Income"  means gross income received by or credited to Label, less all third party transaction costs incurred by  Label  in  connection  with  such  exploitations,  including  manufacturing,  design  and packaging costs, and distribution costs.

1

5. **Royalty Payments and Accounting**.

(a) Accounting statement of royalty payable to Remixer shall be done semi-annually ninety (90) days after June 30th and December 31st. A balance of less than $50 shall be held over until the next applicable accounting period.

(b) All payments to be made to Remixer under this Agreement will be subject to all deductions and/or withholdings required by law, if any.

6. **Re-Recording Restriction**. Remixer agrees that Remixer shall not produce, engineer or mix any other version of any recording of any Composition without the written consent of the Label.

7. **Warranties & Representations**. Remixer warrants and represents that (i) Remixer has the right and power to enter into this Agreement and to perform all the terms hereof; and (ii) neither Remixer's contributions to the Master(s) nor Remixer's contributions to any of the contents thereof, nor the manufacture or sale of records as to such contributions to the Master(s) nor any other exploitation or use thereof, and no materials, ideas or other properties furnished by Remixer and embodied or contained in or used in connection with the Master(s) or the packaging or advertising for phonograph records hereunder, shall violate any law or infringe upon any common law, statutory or other rights of any party, including, without limitation, contractual rights, copyrights and rights of privacy.

8. **Indemnification**. Remixer agrees to defend and indemnify Label and Label's designees, licensees and assigns, against any and all loss, damage, cost and expense (including reasonable legal expenses and attorneys' fees) arising out of or connected with any breach or alleged breach by Remixer of any warranty, representation or agreement made by Remixer in this Agreement. In addition to any other rights or remedies which Label may have by reason of any such breach or alleged breach, Remixer agrees to reimburse Label on demand for any payment made or incurred by Label with respect to the foregoing sentence.

9. **Notices**. The respective addresses of Remixer and Label are set forth on page 1 hereof for all purposes hereunder until notice of a different address is received by the party notified in writing of that change of address. All notices will be in writing and will either be served by certified or registered mail (return receipt requested) or by overnight courier, in each case with all charges prepaid. Notices will be deemed effective when mailed or sent by overnight courier, all charges prepaid, except for notices of a change of address, which will be effective only when received by the party notified. A copy of all notices sent by Label to Remixer or Remixer will be sent by the same method of delivery to ████████ ██████████████████████████████████████████████████████████████

10. **Miscellaneous**. This Agreement sets forth the entire agreement with respect to the subject matter hereof and supersedes all prior agreements between Remixer and Label with respect to the subject matter hereof. This Agreement may not be modified except by a written agreement signed by Remixer and Label. The validity, construction, interpretation and legal effect of this Agreement will be governed by the laws of the State of Colorado applicable to agreements entered into and performed entirely within the State of Colorado. Label and Remixer agree that any action at law or in equity arising out of or relating to this Agreement shall be filed only in the state or federal courts located in Boulder County, Colorado, and Label and Remixer hereby consent and submit to the exclusive jurisdiction of such courts for the purposes of litigating any such action. Except as to breaches that are practically incurable, neither party will be deemed to be in breach of any of their obligations hereunder unless and until the party alleging breach will have given the other party specific

2

written notice by certified or registered mail, return receipt requested, describing in detail the breach and the party alleged to be in breach will fail to cure that breach within 30 days after receipt of that written notice.

**REMIXERS**

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

Print Name:__▉▉▉▉▉▉▉_____

_____
Signature

Print Name:_____

▉▉▉▉▉▉▉▉▉▉▉▉▉▉

By_▉▉▉▉▉▉▉▉▉▉▉▉_____

3

## SCHEDULE A

**COMPOSITION(S)**

# REMIXER AGREEMENT

This Remixer Agreement (this "**Agreement**") is made effective as of ___August 25th___, 2017__ by and between ___██████████████___ ("**Remixer**") whose address is ██████████████████████████████████. ("**Remixer**") whose address is ██████████████████████████████████ and ██████████████████████ ("**Label**") whose address is ██████████████████████, with regard to the services of Remixer to produce and remix the master recording(s) (the "**Master(s)**") of the musical composition(s) listed on <u>Schedule A</u> attached hereto and made a part hereof (the "**Composition(s)**") featuring the performances of ██████ ("**Artist**").

1.     **Services**.  The term of this Agreement (the "**Term**") will commence as of the date hereof and continue until the date on which the Master(s) is delivered to and approved by Label.   During the Term, Remixer will produce, remix and deliver commercially and technically acceptable Master(s) to Label according to a schedule mutually determined by Label and Remixer.

2.     **Rights**.  Label will own all worldwide right, title and interest, including the copyright, in and to the Master(s) and the results and proceeds of Remixer's services hereunder, free of any claims by Remixer.   The Master(s) will be deemed to be "works made for hire" or prepared as part of a work specially ordered by Label for use as a contribution to a collective work.   Remixer agrees that, to the extent (if any) Remixer may be deemed an "author" of the Master(s), Remixer hereby transfers, grants, conveys and assigns to Label, exclusively, perpetually and throughout the universe, all right, title and interest in and to the Master(s), including, but not limited to, the copyright and all exclusive rights of the copyright owner thereof as specified in 17 U.S.C. §106, and all renewals, extensions and revised terms of said copyright throughout the universe.   Remixer grants to Label a power of attorney, irrevocable and coupled with an interest, for Label, in Remixer's name, to apply for and obtain, and on obtaining same, to assign to Label all such rights.   Remixer expressly waives any and all so-called "moral rights" of authors, rental rights, and comparable rights relating to Remixer's services hereunder, the Master(s) and any and all versions and copies thereof.   Remixer will execute and deliver to Label any and all additional documents reasonably necessary or desirable to convey or confirm Label's rights hereunder.

3.     **Name & Likeness / Credit**. Remixer grants to Label the right to use Remixer's legal name, approved likeness and approved biographical material concerning Remixer in Label's and Label's designee's, licensee's and assignee's advertising in connection with the exploitation of the Master(s), and any and all records and other reproductions made therefrom, and advertising and promotion in connection therewith.

4.     **Fee / Royalties**. In consideration for Remixer entering into this Agreement and Remixer performing Remixer's material obligations hereunder, Label will pay to Remixer on exploitations of the Master(s) by Label, including third-party licensing and distribution, Remixer will be paid twelve and a half percent **(12.5%)** of Label's Net Income earned and payable to Label from such exploitations.   As used herein, the term "Net Income" means gross income received by or credited to Label, less all third party transaction costs incurred by Label in connection with such exploitations, including manufacturing, design and packaging costs, and distribution costs.

1

5.    **Royalty Payments and Accounting**.

(a)    Accounting statement of royalty payable to Remixer shall be done semi-annually ninety (90) days after June 30th and December 31st. A balance of less than $50 shall be held over until the next applicable accounting period.

(b)    All payments to be made to Remixer under this Agreement will be subject to all deductions and/or withholdings required by law, if any.

6.    **Re-Recording Restriction**. Remixer agrees that Remixer shall not produce, engineer or mix any other version of any recording of any Composition without the written consent of the Label.

7.    **Warranties & Representations**.  Remixer warrants and represents that (i) Remixer has the right and power to enter into this Agreement and to perform all the terms hereof; and (ii) neither Remixer's contributions to the Master(s) nor Remixer's contributions to any of the contents thereof, nor the manufacture or sale of records as to such contributions to the Master(s) nor any other exploitation or use thereof, and no materials, ideas or other properties furnished by Remixer and embodied or contained in or used in connection with the Master(s) or the packaging or advertising for phonograph records hereunder, shall violate any law or infringe upon any common law, statutory or other rights of any party, including, without limitation, contractual rights, copyrights and rights of privacy.

8.    **Indemnification**.   Remixer agrees to defend and indemnify Label and Label's designees, licensees and assigns, against any and all loss, damage, cost and expense (including reasonable legal expenses and attorneys' fees) arising out of or connected with any breach or alleged breach by Remixer of any warranty, representation or agreement made by Remixer in this Agreement. In addition to any other rights or remedies which Label may have by reason of any such breach or alleged breach, Remixer agrees to reimburse Label on demand for any payment made or incurred by Label with respect to the foregoing sentence.

9.    **Notices**. The respective addresses of Remixer and Label are set forth on page 1 hereof for all purposes hereunder until notice of a different address is received by the party notified in writing of that change of address.  All notices will be in writing and will either be served by certified or registered mail (return receipt requested) or by overnight courier, in each case with all charges prepaid.  Notices will be deemed effective when mailed or sent by overnight courier, all charges prepaid, except for notices of a change of address, which will be effective only when received by the party notified.  A copy of all notices sent by Label to Remixer or Remixer will be sent by the same method of delivery to ▮▮▮▮▮▮▮▮▮▮▮▮

10.    **Miscellaneous**. This Agreement sets forth the entire agreement with respect to the subject matter hereof and supersedes all prior agreements between Remixer and Label with respect to the subject matter hereof.  This Agreement may not be modified except by a written agreement signed by Remixer and Label. The validity, construction, interpretation and legal effect of this Agreement will be governed by the laws of the State of Colorado applicable to agreements entered into and performed entirely within the State of Colorado. Label and Remixer agree that any action at law or in equity arising out of or relating to this Agreement shall be filed only in the state or federal courts located in Boulder County, Colorado, and Label and Remixer hereby consent and submit to the exclusive jurisdiction of such courts for the purposes of litigating any such action. Except as to breaches that are practically incurable, neither party will be deemed to be in breach of any of their obligations hereunder unless and until the party alleging breach will have given the other party specific

2

written notice by certified or registered mail, return receipt requested, describing in detail the breach and the party alleged to be in breach will fail to cure that breach within 30 days after receipt of that written notice.

**REMIXERS**

███████████████████████

By ████████████████████

_____
Signature

Print Name:_____

████████████████████

Signature

Print Name: ██████████_____

██████████████_____

Parent/Guardian

Print Name: ████████_____

3

## SCHEDULE  A

**COMPOSITION(S)**

**REMIXER AGREEMENT**

This Remixer Agreement (this "**Agreement**") is made effective as of December 1, 2017 by and between ▇▇▇▇▇▇▇▇▇▇▇ ("**Remixer**") and ▇▇▇▇▇▇▇▇▇▇▇ ("**Artists**"), with regard to the services of Remixer to produce and remix the master recording (the "**Master**") of the musical composition entitled ▇▇▇▇▇ (the "**Composition**") featuring the performances of Artists.  The new Master will be titled ▇▇▇▇▇▇▇ Remix)."

1.      **Services**.  The term of this Agreement (the "**Term**") will commence as of the date hereof and continue until the date on which the Master is delivered to and approved by Artists. During the Term, Remixer will produce, remix and deliver a commercially and technically acceptable Master to Artists according to a schedule mutually determined by Artists and Remixer.

2.      **Rights**.  Artists will own all worldwide right, title and interest, including the copyright, in and to the Master and the results and proceeds of Remixer's services hereunder, free of any claims by Remixer.  The Remixer's contribution to the Master will be deemed to be "works made for hire" or prepared as part of a work specially ordered by Artists for use as a contribution to a collective work.  Remixer agrees that, to the extent (if any) Remixer may be deemed an "author" of the Master, Remixer hereby transfers, grants, conveys and assigns to Artists, exclusively, perpetually and throughout the universe, all right, title and interest in and to the Master, including, but not limited to, the copyright and all exclusive rights of the copyright owner thereof as specified in 17 U.S.C. §106, and all renewals, extensions and revised terms of said copyright throughout the universe. Remixer grants to Artists a power of attorney, irrevocable and coupled with an interest, for Artists, in Remixer's name, to apply for and obtain, and on obtaining same, to assign to Artists all such rights.  Remixer expressly waives any and all so-called "moral rights" of authors, rental rights, and comparable rights relating to Remixer's services hereunder, the Master and any and all versions and copies thereof.  Remixer will execute and deliver to Artists any and all additional documents reasonably necessary or desirable to convey or confirm Artists' rights hereunder.

3.      **Name & Likeness / Credit**. Remixer grants to Artists the right, but not the obligation, to use Remixer's legal name, approved likeness and approved biographical material in Artists', or Artists' designees', licensees' and assignees', advertising in connection with the exploitation of the Master, and any and all records and other reproductions made therefrom, and advertising and promotion in connection therewith.

4.      **Fee / Royalties**. In consideration for Remixer entering into this Agreement and Remixer performing Remixer's material obligations hereunder, Artists, or Artists' assignee or licensee, will pay to Remixer thirty-three percent (33%) of Net Income earned from exploitations of the Master.  As used herein, the term "Net Income" means gross income received by or credited to Artists, or Artists' assignee or licensee, less all third party transaction costs incurred by Artists, or Artists' assignee or licensee, in connection with such exploitations, including manufacturing, design and packaging costs, distribution costs, and mechanical royalties.

5.      **Royalty Payments and Accounting**.

(a)      Accounting statement of royalty payable to Remixer shall be done semi-annually ninety (90) days after June 30th and December 31st. A balance of less than $50 shall be held over until the next applicable accounting period.

(b)      All payments to be made to Remixer under this Agreement will be subject to all deductions and/or withholdings required by law, if any.

6.      **Re-Recording Restriction**. Remixer agrees that Remixer shall not produce, engineer or mix any other version of any recording of any Composition without the written consent of the Artists.

7.      **Warranties & Representations**.  Remixer warrants and represents that (i) Remixer has the right and power to enter into this Agreement and to perform all the terms hereof; and (ii) neither Remixer's contributions to the Master nor Remixer's contributions to any of the contents thereof, nor the manufacture or sale of records as to such contributions to the Master nor any other exploitation or use thereof, and no materials, ideas or other properties furnished by Remixer and embodied or contained in or used in connection with the Master or the packaging or advertising for phonograph records hereunder, shall violate any law or infringe upon any common law, statutory or other rights of any party, including, without limitation, contractual rights, copyrights and rights of privacy.

8.      **Indemnification**.   Remixer agrees to defend and indemnify Artists and Artists' designees, licensees and assigns, against any and all loss, damage, cost and expense (including reasonable legal expenses and attorneys' fees) arising out of or connected with any breach or alleged breach by Remixer of any warranty, representation or agreement made by Remixer in this Agreement. In addition to any other rights or remedies which Artists may have by reason of any such breach or alleged breach, Remixer agrees to reimburse Artists on demand for any payment made or incurred by Artists with respect to the foregoing sentence.

9.      **Notices**. The respective addresses of Remixer and Artists are set forth below for all purposes hereunder until notice of a different address is received by the party notified in writing of that change of address.  All notices will be in writing and will either be served by certified or registered mail (return receipt requested) or by overnight courier, in each case with all charges prepaid.  Notices will be deemed effective when mailed or sent by overnight courier, all charges prepaid, except for notices of a change of address, which will be effective only when received by the party notified.  A copy of all notices shall be sent by the same method of delivery to ███████████████████████████████ ███████████ ███████████████████████████ ███████████.

10.      **Miscellaneous**. This Agreement sets forth the entire agreement with respect to the subject matter hereof and supersedes all prior agreements between Remixer and Artists with respect to the subject matter hereof.  This Agreement may not be modified except by a written agreement signed by Remixer and Artists. The validity, construction, interpretation and legal effect of this Agreement will be governed by the laws of the State of Colorado applicable to agreements entered into and performed entirely within the State of Colorado. Artists and Remixer agree that any action at law or in equity arising out of or relating to this Agreement shall be filed only in the state or federal courts located in Boulder County, Colorado, and

Artists and Remixer hereby consent and submit to the exclusive jurisdiction of such courts for the purposes of litigating any such action. Except as to breaches that are practically incurable, neither party will be deemed to be in breach of any of their obligations hereunder unless and until the party alleging breach will have given the other party specific written notice by certified or registered mail, return receipt requested, describing in detail the breach and the party alleged to be in breach will fail to cure that breach within 30 days after receipt of that written notice.





Dated as of: July 24, 2017

**Re:**   **Mixing Services /** ████████████████████████████

Dear ██████

This letter, when signed by you and by ██████████████ ("**Company**") f/s/o ████████████ ("**Artist**"), will constitute our sole and binding agreement with respect to the subject matter hereof.

1. **Engagement**. Artist hereby engages you to render your personal services as a remixer (your "**Services**") of one master recording (the "**Recording**") containing Artist's featured vocal performance of the musical composition ████████████ (the "**Composition**") for possible distribution by Artist or by one or more distributors ("**Distributor**").

2. **Payment**.

(a) In full consideration of your Services, Artist will pay to you a fee of £4500 (the "**Payment**") which will be inclusive of all studio, engineering and other costs incurred in connection with your Services. 50% of the Payment will be due on commencement of the Services and the remaining 50% will be due on the technically satisfactory delivery of the Recording with all parts and stems of all instrumentals and vocals clearly labeled ("**Delivery**"). Artist hereby acknowledges Delivery and you hereby acknowledge receipt of the Payment.

(b) Artist will instruct SoundExchange, Inc., pursuant to the letter of direction attached to this Agreement as <u>Exhibit A</u>, to pay to you an amount equal to five (5) percentage points of the "Featured Artist" share of public performance royalties otherwise payable to Artist by SoundExchange with respect to the Recording. No failure by SoundExchange to account for or pay such royalty to you will be deemed a breach of this Agreement.

3. **Recording Procedure**. All mixing hereunder will be done at a studio in ██████████ and all costs paid or incurred by, or on behalf of, Artist in excess of the approved budget which are solely caused by your acts or omissions ("**Excess Costs**") will be recoupable from all monies payable to you hereunder. Artist hereby acknowledges that there are no Excess Costs.

4. **Ownership**. You agree and acknowledged that Artist is the sole and exclusive owner of all rights (including worldwide copyrights) in and to the Recording. The Recording is deemed a work-made-for-hire by you for Artist under the copyright laws of the United States. If the Recording is deemed not to be a work-made-for-hire, all of your rights and interests in the Recording will be deemed irrevocably assigned and transferred to Artist by this agreement.

5. **Composition**. You acknowledge that you did not make any contribution to the writing or arranging of the Composition. Accordingly, you are not entitled to any right, title or interest of any nature, kind or description in or to the Composition, including but not limited to, the copyright therein, nor will you be entitled to any mechanical, performance or other royalties in connection with the exploitation of the Composition.

6. **Credit**. Artist will instruct and use reasonable efforts to cause Distributor, if any, to afford you a credit in the following form: "Mixed by ██████████" on the liner notes, labels and outside back covers of all records and CDs containing the Recording, trade and consumer ads one-quarter page or larger, and Billboard and Music Week strip ads. Notwithstanding anything to the contrary contained herein, all such credits will be subject to Distributor's normal policies.

7. **Name and Likeness**. You grant to Artist the perpetual right to use and to permit others to use  your name, approved likeness, other approved identifications, and approved biographical material concerning  you (collectively, "**Likeness Materials**") in connection with the exploitation of the Recording and purposes of trade.  Neither Artist's nor any licensee's, including Distributor's, inadvertent failure to afford  you credit or obtain your approval of Likeness Materials will be deemed a

ACTIVE\52236368.v1-12/6/17

breach hereof; provided, however that, following receipt of written notification from you, Artist will use reasonable efforts to promptly correct or cause such failure to be corrected on all future runs.

8. **Promotion**.  Artist and you each agree to use reasonable efforts to promote the Recording on their respective social media platforms including, but not limited to, Twitter, Instagram and Facebook.  You also agree to promote the Recording on your Sound Cloud Page.

9. **Warranties and Representations**.  Solely with respect to your contribution, you represent and warrant that: (i) you have the legal right and power to enter into and fully perform the terms and obligations of this Agreement; (ii) none of your contributions to the Recording infringe or violate the works or rights of others; (iii)) you will complete and deliver to Artist in a timely manner all necessary union forms (e.g., form B's), immigration form I-9's and IRS form W-4's for all performers engaged by you who render services in connection with the Recording; (iv) you will not include any so-called "sample" in the Recording; and (v) you will not mix any recording containing the Composition for any entity or person other than Artist for or in connection with the recording or exploitation of any phonograph record  for 5 years subsequent to the date of Delivery.

10. **Indemnification**.  You will indemnify and hold harmless Artist, Distributor and their respective assignees and licensees from and against any and all third party claims, damages, liabilities, costs and expenses, including legal expenses and reasonable counsel fees arising out of any breach by you of any warranty, representation or agreement made by you herein.  You will reimburse each indemnified party on demand for any payment made at any time after the date hereof in respect of any liability or claim for which they are entitled to be indemnified.  Artist or Distributor will be entitled to withhold from any amounts payable to you under this agreement such amounts as are reasonably related to the potential liability in issue, provided that if a claim does not result in litigation being commenced within one year from the date such claim is initially received or if you post a bond satisfactory to Artist or Distributor (as applicable) in their discretion, then any monies withheld will be released to you, provided further that if any such claim is litigated after one year from the date it was initially made, Artist or Distributor may thereafter withhold monies due in accordance with the preceding sentence.

11.  **Notices**.  All notices to be given to either party hereunder will be given to the relevant party at the address stated above or such other address as each party respectively may hereafter designate by notice in writing to the other.  All notices must be in writing and must be personally delivered, sent by registered or certified mail (return receipt requested) or sent by overnight air express (or courier shipment if outside the United States) if such service provides proof of delivery, and the date of personal delivery or five business days after mailing will be deemed the date of the giving thereof (except notices of change of address, the date of which will be the date of receipt by the receiving party).

12.  **Assignment**.  You may not assign this Agreement or any of your rights or responsibilities hereunder, or delegate any of your duties hereunder.

13.  **Miscellaneous**.  This agreement is binding on the parties hereto and will be governed and construed in accordance with the laws of the State of New York.  The courts of the State of New York will have exclusive jurisdiction over any dispute arising hereunder or in connection herewith and the parties hereto consent to the personal jurisdiction of the courts of the State of New York.  In entering into this agreement and providing services pursuant hereto, you have and will have the status of an independent contractor and nothing herein will contemplate or constitute you as Artist's agent or employee.  If any part of this agreement is determined to be void, invalid, inoperative or unenforceable by a court of competent jurisdiction or by any other legally constituted body having jurisdiction to make such determination, such decision will not affect any other provision hereof, and the remainder of this agreement will be effective as though such void, invalid, inoperative or unenforceable provision had not been contained herein.  The terms in this agreement and any exhibits and attachments hereto constitute the entire agreement between the parties with respect to the subject matter hereof, all prior negotiations and understandings being merged herein.  You represent that no person acting or purporting to act on behalf of Artist has made any promise or representation on which you have relied except those expressly stated herein.  This agreement may only be altered by an instrument signed by an authorized signer on behalf of each party hereto.  This agreement will become effective only when signed by an authorized signer on behalf of each party hereto.

If the foregoing accurately reflects our understanding please sign in the space provide below.

Very truly yours,





AGREED TO AND ACCEPTED:

By:

ACTIVE\52236368.v1-12/6/17

## REMIX AGREEMENT

For good and valuable consideration, including, without limitation, in consideration of the "Fee" (hereafter defined) and those certain rights granted to ███████████████ ("you") by ███████████████ ("we", and/or "Company") with respect to the Composition (hereafter defined) you and we hereby agree as follows:

1.        You shall create an original remix master recording (the "Master") of the musical composition ("Composition") embodying elements of the original master recording ("Original Master") and musical composition ("Original Composition") entitled "█████████████" You shall deliver a Master that is technically and commercially satisfactory to Company. We acknowledge satisfactory delivery of the Master.

2.        You shall be paid a total fee (the "Fee") of One Thousand Dollars ($1000) in respect of the services performed hereunder, payable upon the later of: (A) delivery of the Master; and (B) full execution of this agreement.  The Fee payable hereunder shall constitute payment in full for your services hereunder and, without limiting the generality of the foregoing, no additional payments shall be made to you (or any third parties relating to their exclusive rights to your recording and performance services) in exchange for your services hereunder in connection with the Master and Composition.

3.        You hereby acknowledge that your contributions to the Master (excluding the Composition to the extent of your interest therein and thereto) shall be owned entirely free and clear by us, our assigns and designees as a work-made-for-hire (as defined under United States copyright law) and, if same are not deemed works-made-for-hire, are hereby assigned by you to us or our designee.  For avoidance of doubt, you hereby grant to us the exclusive right in perpetuity throughout the universe to edit, alter, re-mix, adapt, and change any aspect of the Master; to manufacture, duplicate, sell, distribute, exhibit, publicly perform, broadcast, webcast, advertise, lease, license, convey and otherwise exploit, use or dispose of phonograph records (including without limitation single records), videos, motion pictures, television and/or radio programs, or other audio and/or visual productions embodying your services hereunder, by any method now or hereafter known, in any field of use, under any trademarks, trade names, or labels (collectively the "Exploitations"), all upon such terms and conditions as we may approve; to permit any other person, firm, or corporation to do any or all of the foregoing; or, we may refrain from doing any or all of the foregoing.  You further hereby grant to us the non-exclusive right in perpetuity throughout the universe to use your professional name (including, without limitation, all professional names you may use now or in the future) and approved likenesses, approved photographs and approved biographies of you in connection with the Exploitations.  You expressly waive any rights in law or in equity or otherwise which you may claim to have based upon any alleged infringement of your respective so-called "moral rights" in connection with your services as embodied in the Master.

4.        With respect to the Master, we shall instruct and use reasonable efforts to cause Distributor to provide you credit in the form "████ Remix" in the liner notes of any record containing a Master, including the back cover of any "single" embodying a Master on the "A-side", on metadata in connection with electronic transmissions of the Master. In the event we materially alter any Master, you shall have the right to remove your credit with respect to such altered Master. No inadvertent non-repetitive credit failure shall constitute a breach hereof with the understanding that we shall use reasonable efforts to correct such failure on a prospective basis.

5.        Company and you hereby acknowledge that you shall own an undivided Twenty Five

Percent (25%) interest in and to the Composition. Company and you will have the right to administer each party's respective interests throughout the world in and to the Composition during the full term of worldwide copyright, including any and all renewals, reversions and extensions thereof, in accordance with the terms of this agreement.  Neither party shall have the right to bind the other with respect to the Composition without such party's express written consent (email constituting a writing for such purpose). For purposes of this agreement, the term "administer" will mean the right to exploit such party's respective interest in the Composition, to print, publish, sell, use and license the use of such party's respective interest in the Composition throughout the world, to execute any and all licenses and agreements affecting or respecting such party's respective interest in the Composition, including, without limitation, licenses for mechanical reproduction, performance, synchronization, print and sub-publication, to conduct all legal claims and defenses with respect to such party's respective interest in the Composition, and to assign or license such rights to others. Notwithstanding the foregoing, you shall issue to Company (or Company's designee) licenses of any type or nature authorizing the use of your share of Composition in any manner and/or media now known or hereafter devised in connection with the exploitation by Company (or Company's designees) of the Master (including, without limitation, mechanical and/or synchronization licenses), provided that such licenses under this subparagraph shall be issued on precisely the same terms and conditions (i.e., on a pro rata "most favored nations" basis) as are granted by Company (or its third party publishers) with respect to the same (or substantially similar) uses of its interest in the Composition in connection with the project concerned, including, without limitation, gratis licenses.  For avoidance of doubt, with respect to your share of the Composition that is owned or controlled by third party publishers (each, a "Publisher"), to the extent you have approval rights over certain licensing decisions under your agreement with the Publisher, you hereby agree to grant your approval to any such request Company makes to the Publisher hereunder.

    5.    You agree to execute any documents and do any other acts which may be reasonably required by Company or its assignees or licensees to further evidence or effectuate the terms and provisions of this agreement in a manner consistent with the terms and provisions of this agreement (including, without limitation, short form assignments of copyright).  Upon your failure to do so within five (5) days of your receipt of such documents, you hereby appoint Company (or Company's designee) as your true and lawful limited attorney-in-fact solely for such purposes, including the right to execute any such documents in your name and further to renew, pursuant to law, for and in the name of Company (or Company's designee or in the name of any other person at their discretion) the copyrights in and to the Master and to execute a formal assignment of each renewal copyright, for the use and benefit of Company (or Company's designee), it being acknowledged by you that such appointment is irrevocable and shall be deemed a power coupled with an interest, with full power of substitution and delegation.

    6.    You acknowledge and agree that, apart from your contribution to the Master and Composition, you did not contribute in any manner to any master recording or composition featuring the performance of the artist professionally known as "▮▮▮▮▮."

    7.    Each party warrants and represents that each respective party has the right to enter into this agreement. You represent and warrant that you have the right to grant to Company (or Company's designee) all of the rights in and to the Master and Composition and the results and proceeds of your services as are granted herein, that no consents, approvals or waivers are needed from any third party. Each party represents and warrants that each party's respective contributions to the Master and Composition do not and shall not violate or infringe upon any right of any party and shall not be the subject of any litigation or of any claim that might give rise to litigation.  Each party hereby indemnifies and holds harmless the other (and each such party's designee) and its respective employees, officers, agents, assignees and licensees, from and against any losses, costs, liabilities, claims, damages or expenses (including, without limitation, court costs and reasonably outside attorneys' fees, whether or not in connection with litigation) arising out of any third party claim or action by a third party which is

inconsistent with any warranty and representation made by each respective party herein which is reduced to a final judgment in a court of competent jurisdiction or settled with your prior written consent, not to be unreasonably withheld.

8.      You further acknowledge that in the event of any breach by Company (or Company's designees or successors or assignees) of this agreement, you will be limited to your remedy at law for damages (if any) and will not have the right to terminate or rescind this agreement or to enjoin the distribution, exploitation or advertising of the Composition, which rights you expressly waive hereunder.

9.      Notwithstanding anything to the foregoing herein and for the absolute avoidance of doubt, you hereby acknowledge and agree that: (a) you rendered no services in connection with the Original Master; and (b) you did not contribute in any manner to the Original Composition (i.e. as a co-writer, co-creator, joint owner or otherwise) and therefore shall not claim any ownership interest in and to the underlying copyright therein and thereto.

10.      This agreement contains the entire understanding between the parties, and all of its terms, conditions and covenants shall be binding upon and shall inure to the benefit of the respective parties and their heirs, successors and assigns.  No modification or waiver hereunder shall be valid unless the same is in writing and is signed by the party sought to be bound.

11.      This document contains important legal terms and rights that affect you and Company has advised you to secure independent legal counsel. You hereby acknowledge that you have secured or had the opportunity to secure legal counsel to represent you in connection with this agreement. Should you choose not to secure independent counsel, you acknowledge that your decision will have been made knowingly and willfully.

12.      If any provision of this agreement shall be held void, voidable, invalid or against public policy, no other provision of this agreement shall be affected thereby and such provision shall be deemed automatically amended only to such extent as necessary to bring such provision into compliance with law, and, as so amended, this agreement shall remain in full force and effect. This agreement may be signed in any number of counterparts, each such counterpart being deemed to be an original instrument, but all of which shall constitute one document. Delivery of a signed counterpart of a signature page to this agreement by facsimile or other electronic means shall be effective as delivery of a manually executed counterpart of this agreement.

13.      This agreement shall be deemed to have been made in the state of California and its validity, construction, performance, and breach shall be governed by the laws of the State of California applicable to agreements made and to be wholly performed therein. Any and all disputes or controversies arising under this agreement, or any of its terms, any effort by any party to enforce, interpret, construe, rescind, terminate or annul this agreement, or any provision thereof (including the determination of the scope or applicability of this agreement to arbitrate), shall be determined by binding arbitration before a single arbitrator (who shall be a retired judge of a state or federal court with experience in the entertainment industry). Any process in any such arbitration, action or proceeding commenced may be served upon either party, among other methods, by personally delivering or mailing the same, via registered or certified mail, addressed to the other party, as applicable, at the address given in this agreement. The arbitration shall be administered by the Judicial Arbitration and Mediation Services ("JAMS") pursuant to its Comprehensive Arbitration Rules and Procedures then in effect (or other mutually agreeable alternative dispute resolution service) and shall be conducted in Los Angeles, California. The arbitrator shall issue a written decision that includes the essential findings and conclusions upon which the decision is based, which shall be signed and dated. Subject to the foregoing sentence, THE PARTIES HEREBY WAIVE ANY RIGHTS THEY MAY HAVE TO TRIAL BY JURY IN

REGARD TO CLAIMS SUBJECT TO ARBITRATION HEREUNDER. The arbitrator's ruling in the arbitration shall be final and binding and not subject to appeal or challenge.  Judgment on any award may be entered in any court having jurisdiction.  The parties further agree that the arbitration proceedings, testimony, discovery and documents filed in the course of such proceedings, including the fact that the arbitration is being conducted, will be treated as confidential and will not be disclosed to any third party to such proceedings, except the arbitrator(s) and their staff, the parties' attorneys and their staff, and any experts retained by the parties.

IN WITNESS WHEREOF, the parties hereto have executed this agreement on this 30th day of October.





# REMIX AGREEMENT



*(herein referred to as "we" or "us")*

AND



*(herein referred to as "you")*

Dear ███,

**Regarding the remix of the recording "█████████" written by ████████ (the Artist).**

We set out below the terms of agreement in relation to you remixing the above-mentioned track.

**1.      Engagement:**

We hereby engage you to remix the above recording by the Artist up to delivery in accordance with clause 5 below. Your mixes of the track and all deliveries thereof are referred to as "the Remixes"

**2.      Time & Place of Recording:**

At such times and studios as You shall reasonably decide. You will produce the Remixes on your own risk in a place of your decision. You will not engage any musician or performer in connection herewith. In the event that you engage such a person, you will pay any and all remuneration due to any such persons and will ensure that all necessary consent forms are duly signed and all necessary rights are vested so as to enable us to fully exploit the Remixes hereunder.

**3.      Standard of Recordings:**

The Recordings are to be technically suitable for the mastering and manufacturing of records and artistically satisfactory in our reasonable opinion. You shall promptly carry out any additional remixing as we shall reasonably require without further payment by us in the event that any of the Tracks is/are not in our reasonable opinion satisfactory as aforesaid.

**4.      Delivery:**

You shall deliver upon April 2014 the following:

(i)      Fully mixed, edited, equalized and leadered masters of the Recordings (CD-R or DAT)
(ii)     Identifiably marked up, finished, fully edited and mixed multi-track
(iii)    Copy Masters
(iv)     All other material information reasonably required by us with regard to use of the Recordings.

**5.     Remuneration:**

In full consideration of your services hereunder we will pay you the Fee as of

1500 $ (fifteen hundred US Dollar)

(which shall be inclusive of all recording costs (including studio fees, material, etc.) and any remuneration payable to you) which we will pay as to half on signature hereof and the balance on our acceptance of the Remixes and subject always to all necessary consents and clearances having been obtained.

Your services hereunder shall be deemed to include your services as arranger, engineer, programmer, musician and/or vocalist and you shall not be entitled to any further remuneration therefore.

**6.      Tax:**

If you are registered for VAT all monies due to you shall be subject to VAT (where payable) subject to you providing a valid VAT invoice in respect thereto.

If and to the extent the remuneration to be paid pursuant to this agreement is subject to withholding tax, we are entitled to withhold the taxes in the amount established by law and to pay such taxes to the appropriate tax authority or tax office. This provision shall not apply if and to the extent you provide us with a valid and appropriate certificate of exemption, which will be sufficient to exempt us from paying such taxes according to the applicable law and the relevant double tax convention.

**7.      Rights:**

We shall be the first owner of the entire copyright – excluding publishing - and all other rights in and to the Remixes hereunder and we shall have the absolute right to exploit the Remixes throughout the world and you hereby grant to us all consents necessary to enable us to so exploit the Remixes in any manner, without any timely restriction worldwide and waive any so called moral rights or similar rights you may have or acquire in connection herewith. To the extent that you acquire any copyright in or to the Remixes you hereby assign the same to us by way of present assignment of present and/or future copyright for the full duration thereof (including all extensions and renewals).

Therefore we are particularly entitled to reproduce the Remixes by means of production of compact and other discs (e.g. CD, Vinyl records, CD ROM, CDI, CD extra, Minidisc, CDV, DVDs, SACD etc. including multimedia and interactive devices), of tapes (music cassettes, reel tapes, DCCs, DATs, videos etc.) or by production of other carriers (chips, cards etc.) and to sell (e.g. via clubs or by mail order, which includes Direct TV and on-line Sales), to rent or to distribute the Remixes in any incorporeal way - particularly on a worldwide basis and via online services and data bases). Our rights also include the right to couple the Remixes with other recordings of the same artist or with recordings of other artists as well as the right to use the Remixes for the production of so-called "Premiums" (especially manufactured for a client using his trademark and advertisement). Furthermore we are entitled to use the Remixes as music for movies, videos, commercials etc. and for all other forms of synchronisation. We are entitled to use the Remixes for any advertising purposes, including but not limited to promotion for the recording and other goods and services by us or any third party. We are entitled to edit the Remixes in any way. If we alter your Remix work in any way, you will have the right to have your names removed.

We are entitled to communicate and make available to the public the Remixes, to broadcast them by private or public broadcasting organisations via cable or satellite or via other technical devices and to distribute them in any other digital or analogue ways.

We are entitled to raise financial claims regarding the exploitation of the Remixes in our own name. Our rights extend to all present and future forms of exploitation including those not explicitly listed above. We are entitled to transfer all aforementioned rights to third parties or have such rights exploited by third parties.

**8.     Compositions:**

Deleted

**9.     Samples:**

You shall not include any so-called samples (whether of musical and/or literary works and/or sound recordings) in the Remixes without our prior written consent.

**10.     Credit and Release:**

We shall use best endeavors to give a credit on the sleeve or inlay card of the records incorporating Recordings in the form of:

 ( Remix)

Save that our inadvertent failure to do so shall not constitute a breach of this agreement provided that we use our reasonable endeavors to rectify it on a prospective basis.

We are not obliged to release the Remixes hereunder.

**11.     Publicity Materials:**

We shall have the non-exclusive right to use and authorize others to use your name, photograph, likeness, and biographical material as approved by you (your approval not to be unreasonably withheld or delayed and deemed given in respect of such materials supplied by you on your behalf) to promote the Remix.

**12.     Remixing Restriction:**

You shall not remix a recording by any third party of any composition embodied on the Recording for a period of 5 (five) years from the date of this agreement.

**13.     Warranties:**

You warrant that the performance of your obligations hereunder and the Remixes themselves shall not be criminally obscene or defamatory of and will not infringe the rights of any third party and that the consideration detailed in this letter constitutes full and equitable remuneration for your services including all so called rental and lending rights. You guarantee to indemnify us against all claims, losses, damages, costs and expenses (including legal fees) arising out of any breach by you of this or any other provision hereunder.

**14.     Further Documents:**

You agree to sign such further documents as we may reasonably require to give full effect to our agreement.

**15.     Entire Agreement:**

████████████████████████████████████

This agreement sets forth the entire agreement and understanding of the parties on the subject matter contained herein.

No modification, amendment or waiver of this letter or any provisions of it shall be binding upon either party unless confirmed in writing under our respective hands or in the hands of our respective duly authorised representatives. If any part of this agreement shall be declared invalid or unenforceable by a court of competent jurisdiction it shall not affect the validity of the rest of the agreement.

Instead of the provision thus invalidated, a provision to the effect shall govern that would have been stipulated in due consideration of both parties' commercial interest at the time of the conclusion of this agreement.

**14.  Governing Law and Jurisdiction:**

This agreement is construed under and shall be governed by German Law. Place of exclusive jurisdiction shall be Berlin in Germany.

If the above accurately reflects your understanding of our agreement please sign where indicated and return one copy of this letter to us.

Yours sincerely,



For and on behalf of

Berlin,

For and on behalf of

LA,



(“we” “us” “our” construed accordingly)

TO: ████████████████
████████████████████
████████████████

(“you” “your” construed accordingly)

10/05/16

Dear ██████████

**YOUR REMIXING SERVICES-** ████████████████

1.    We engage you to provide the services of ██████████ as a remixer of the Recording.  You agree to remix the Recording to the best of your skill and ability at times and places to be designated by us and within the Budget and to deliver to us when we reasonably require but no later than the Delivery Date a first class master embodying the Recording remixed by you in the Formats ("Remixer Recording") which are technically and artistically satisfactory to us.  We hereby acknowledge satisfactory completion of your services and satisfactory delivery of the Remixer Recording hereunder.

2.    We will pay you the Fee in respect of your services referred to in this agreement subject to receipt by us of a quote within the Universal Uniport system www.uniport.net, which Fee shall be paid as to fifty per cent (50%) when remixing commences ("First Half") and, subject to you signing and returning the attached duplicate of this letter and the forms referred to below,  fifty per cent (50%) when we accept the Remixer Recording. The Fee will be your sole remuneration in respect of your services and the exploitation of the Recording and the Remixer Recording and will constitute fair and equitable remuneration for the services to be rendered under this agreement (and the product thereof) and the rights granted under this agreement including, without limitation, all rental and lending rights.  The Fee shall be fully inclusive of all costs to be incurred in connection with the remixing by you of the Recording which shall not exceed the Budget.  If any such costs are incurred in excess of the amount of the Budget, you shall pay such excess costs.  To the extent that such excess costs are incurred we shall have the right to deduct the same from the Fee prior to paying the balance aforesaid.  You shall not have, and shall not purport to have, any authority to assume any liability on our behalf. For the avoidance of doubt any additional equipment hire over and above the amount of the Budget will only be allowed with prior written approval.  The Budget specified in the Schedule is the total amount of recording costs for the services provided for under this agreement and no additional payments will be approved by us for any other items including without limitation for per diems, food costs, phone calls, couriers and taxis.

3.    You hereby irrevocably direct and authorise us to pay one thousand US dollars ($1,000) of the First Half directly to ████████████████████████████████████
██████████ ("Counsel"), subject to receipt by us of a quote from Counsel within the Universal Uniport system www.uniport.net. The foregoing authorisation will take effect from the date of this Agreement and shall not be revocable by you (or any of your agents, representatives, attorneys, successors in title, or assignees). Our compliance with this authorisation will constitute an accommodation to you alone; Counsel is not and will not be deemed to be the beneficiary of this authorisation or the Agreement. All payments to Counsel under this authorisation will constitute payment to you and we will have no liability whatsoever by reason of any erroneous payment or failure to comply with this authorisation.

4.    You irrevocably and unconditionally to the fullest extent permitted by law assign to us (by way of assignment of present and future copyright) all the copyright and other rights in and to the products of your services under this agreement to hold to us absolutely without reservation for the use and benefit of us and our successors, assigns and licensees throughout the world for the full period of copyright including all renewals, reversions and extensions; give all such consents as may be necessary to enable us to exploit, and authorise others to exploit, worldwide in any and all media by any and all means now known or developed in the future the products of your services under this agreement; waive all so-called "moral rights" or similar rights now existing or created in the future in any part of the world in respect of the Recording and the Remixer Recording; grant to us the exclusive rental and lending rights in and to the products of your services under this agreement which you may have at the date hereof, or which may after the date hereof be conferred on you, whether pursuant to the Copyright and Related Rights Regulations 1996 or otherwise; and grant to us the right to use, and to authorise others to use, your name, professional name, prior approved biographical details, prior approved photographs and other prior approved likenesses in all media solely in connection with the exploitation of the products of your services under this agreement.



5.      We will accord you the Credit on the labels and, where practicable, the sleeves of all records wholly embodying the Remixer Recording but if we inadvertently fail to do so we shall only be obliged to use reasonable endeavours to rectify the error on all labels and, if applicable, sleeves manufactured after we receive written notice of the error from you.

6.      You agree to complete and obtain signature of a BPI/Musicians' Union *"Musician's Consent Form"* in respect of each musician/vocalist participating in the Remixer Recording should there be any.

7.      You warrant that the Remixer Recording will not embody any samples without our prior written approval and that the Remixer Recording will not violate or infringe any common law or statutory right of any person, firm or corporation including, but without limitation, contractual rights and copyright.  You further warrant that you will, in addition to the Remixer Recording, deliver to us all other tapes of recordings of the Artist(s)'s performances of the composition(s) hereunder which are in your possession at the end of the recording sessions and that that all information in the studio recording form referred to in this agreement and delivered to us is correct to the best of your knowledge.

8.      You shall indemnify us against any and all claims, costs, proceedings, demands, losses, damages and expenses resulting from or by reason of any claim arising from a breach of any of your representations, warranties, agreements and undertakings in this agreement, which claim is either adjudicated or settled with your approval not to be unreasonably withheld or delayed. We shall hold you harmless against any claims from third parties relating to uncleared samples included in the Recording which are not introduced by you as party to the Remix Recording.

9.      If we agree in writing that the Remixer Recording may embody one or more samples, you will deliver to us, at the same time as you deliver the master embodying the Remixer Recording, a complete list of all such samples.

10.     This agreement shall be governed by, and construed in accordance with, the laws of England and Wales, whose courts shall be the courts of exclusive jurisdiction.



<u>SCHEDULE</u>

In this agreement:

| | | |
|---|---|---|
| 1. | "Artist" means: | ███████ |
| 2. | "Budget" means: | Inclusive of Fee |
| 3. | "Credit" means: | ████ |
| 4. | "Fee" means: | Three thousand US dollars ($3,000) in total which shall be fully inclusive of the Budget |
| 5. | " Recording " means: | The recording embodying the Artist's performance of the composition entitled '████████' |
| 6. | "Format" means: | Vocal and instrumental and if requested by us, dub, radio edit, club mixes. Remixer Recording to be delivered in standard 16 bit format and 24 bit/96khz form (for high resolution delivery)by a secure and previously agreed digital link. All links must be fully labelled with complete session information. All of which must be delivered directly to the A&R person issuing this Schedule. |
| 7. | "Delivery Date" means: | TBC |

Please confirm your agreement to the above by signing and returning the enclosed duplicate of this agreement. This Agreement will be valid and binding once fully executed by the parties hereto.

Yours faithfully

I acknowledge that I have read the above Agreement, in particular clause 3, and represent that ████████████ has all the necessary rights and consents to enter the Agreement and I hereby assent to its execution by ████ and ████ ████████████. I agree to be bound by the terms and conditions of the Agreement including without limiting the generality of the foregoing, any provisions of the Agreement relating me in any way, directly or indirectly, and any provisions relating my services or performances to be rendered thereunder.

I hereby warrant and undertake that I shall not enforce my moral rights in the Recording against ████ or any of its licensees or assigns.

I hereby warrant and undertake that I have neither written nor composed, whether in whole or in part, the musical and/or literary work which is the subject of the Recording and have no right or benefit in the same

I hereby confirm and agree that I shall look solely to ████ and not to ████ for all compensation and other remuneration for any and all services and rights which I render under this Agreement and I acknowledge and agree that payments to ████ by ████ under this Agreement constitutes fair and equitable remuneration for all rental and lending rights so granted and I acknowledge that such remuneration is payable on my behalf to ████ and I shall look to ████ for such remuneration SAVE AS to any artist's share so called public performance and/or neighbouring rights payments to which I am entitled.

........

**ARTIST AGREEMENT**

AGREEMENT dated as of August 20, 2015, between ▉▉▉▉▉▉▉▉▉ ("Owner"), whose address is c/o ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉, and ▉▉▉▉▉▉▉▉▉▉▉▉ ("Artist"), whose address is ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉, regarding Owner's engagement of Artist to remix a sound recording performed and owned by Owner.

1.  **Engagement.**

    a.  Owner engages Artist to produce Remixes ("Remixes") of the sound recording entitled "▉▉▉▉▉▉▉" ("Recording"). The Remixes will include the following versions of the Recording: radio edit, club mix, television instrumental mix and dub mix. The Remixes will be consistent with Owner's instructions and subject to Owner's final approval.

    b.  Artist will produce and Deliver the Remixes to Owner on or before the Due Date designated by Owner. As used in this agreement, "Delivery" of each Remix means (i) delivery of the Remix to Owner in a form that is both technically and commercially acceptable; and (ii) delivery to Owner of (A) a clearly labeled production master in the format customarily utilized by Owner; (B) the source multi-track masters and (C) written production credits.

2.  **Compensation.** In full consideration of the results and proceeds of Artist's services, and Artist's representations and warranties, and provided that Artist executes and delivers this agreement and is not in breach, Owner will pay Artist $4,000, receipt of which is acknowledged.

3.  **Ownership.** The Remixes will be a work made for hire for Owner, and Owner shall have the exclusive right to copyright the Remixes in its name and to secure any and all renewals and extensions of such copyright throughout the world. Accordingly, the Recording, the Remixes, and all duplicates and derivatives thereof, are and will be the property of Owner throughout the world in perpetuity from the inception of their creation, and Owner shall have the exclusive right to use or not use the Remixes in any medium or manner, by any method now known or hereafter created without any liability or obligation to Artist other than pursuant to section 2, including any liability or obligation for residuals, reuse fees or royalties. Without limiting the foregoing, Artist assigns to Owner ownership and all rights, if any, including the copyright, in the Remixes and agrees to execute and deliver to Owner any additional documents Owner considers necessary or desirable to confirm Owner's rights. If Artist fails to execute and deliver any such documents, Owner may sign such documents in Artist's name as Artist's irrevocable attorney-in-fact. Owner may alter and edit the Remixes; Artist waives any moral rights in the Remixes.

4.  **Credit.** Owner will use reasonable efforts to give Artist credit on the packaging of records containing the Remixes and in trade advertising for the Remixes, in substantially the form "Remixed by ▉▉▉▉▉▉▉" Any failure or inability of Owner or a third party to give credit to Artist will not constitute a breach of this agreement nor entitle Artist to injunctive or equitable relief.

S.  **Name and Likeness.** Owner has the right to use Artist's legal and professional name, likeness and biographical material in connection with the sale, advertising, publicizing, promotion and

other use and exploitation of the Recording, the Remixes or any rights in or elements of either of them.

**6.**     **Representations and Warranties.** Artist warrants and represents that:

a.     Artist has the right to enter into and perform this agreement.

b.     Artist will not incorporate any samples or side artist performances into the Remixes without Owner's prior written consent.

c.     Artist shall obtain and supply to Owner all necessary licenses, consents, permissions and waivers from all persons rendering services, or furnishing rights, materials or facilities in connection with the Remixes, as well as all payroll forms, invoices, receipts and documents with respect to the performance of Artist's services.

d.     The Remixes and each element incorporated in the Remixes (including samples) will be fully cleared and will not violate or infringe upon any rights of any person or entity.

**7.**     **Indemnity.** Artist will indemnify, defend and hold harmless Owner and Owner's licensees, successors, assigns, employees and agents from any and all liability, costs, losses and expenses, including reasonable attorneys' fees, arising out of or connected with any claims by any third party or any act by Artist which is inconsistent with any of the warranties, representations or agreements made by Artist in this agreement.

**8.**     **Security.** Artist acknowledges that the Recording may have not been released to the public. Except to the extent necessary for Artist to render Artist's services hereunder, Artist agrees not to sell, transfer or copy in any way (including by CD burning, loading onto a computer or uploading to the Internet) any sound recording provided by Owner. Artist agrees that Artist will not make sound recordings provided hereunder available in any manner to a third party and will take all necessary steps to make sure that they do not pass into the possession of any third party.

**9.**     **General.** This agreement may not be assigned by Artist, and any purported assignment will be void. This agreement will be governed by California law applicable to agreements entered into and fully to be performed in that state. This is the entire agreement of the parties concerning its subject matter; any prior negotiations or understandings are merged herein. This agreement may be modified only by a signed writing. A waiver of any provision will not be deemed continuing, nor to waive any other provision. If any provision of this agreement is unenforceable, it may be severed and the remaining provisions enforced. This agreement will be binding on and inure to the benefit of the parties successors and permitted assigns. This agreement may be executed in counterparts and delivered by fax or email.

